Commonwealth *vs.* George B. Gilbert.

Essex.    May 7, 1974. — July 16, 1974.

Present: Tauro, C.J., Reardon, Hennessey, Kaplan, & Wilkins, JJ.

*Homicide.    Practice, Criminal,* Speedy trial.    *Constitutional Law,* Speedy trial.    *Arrest.    Evidence,* Opinion: expert; Of state of mind; Relevancy and materiality.    *Witness,* Expert.    *Jurisdiction,* Of crime.

In the circumstances, the defendant in a murder case was not unconstitutionally denied a speedy trial where it appeared that after an absence from Massachusetts for about four years following the crime he returned here and was then arraigned on an indictment for the crime and that, although his trial did not commence until some thirty-one months later, the delay was in large part due to him and his counsel and the defendant, who had been out on bail, did not assert his right to a speedy trial during the delay.  [22-23]

At a murder trial, a radiologist of extensive experience in comparative analysis of X-rays of the bones appeared to be qualified to give, and there was no error in admitting in evidence, his opinion, based on a comparison of X-rays of human remains found in a plastic bag in the ocean some months after the crime and X-rays of the alleged victim taken before the crime, that such human remains were those of the alleged victim; there was no merit in a contention by the defendant that the radiologist's testimony should have been excluded as based on a premise which had not yet received full scientific approval.  [23-24]

Where, at a murder trial, a radiologist, on the basis of a novel scientific identification technique in which he had expertise, had testified to an opinion that certain human remains were those of the alleged victim, there was no error in admitting in evidence a corroborating opinion of a professor of anatomy who had had the benefit of the report and

conclusion of the radiologist and would not have offered his own opinion without them, but who had done some independent analysis and was not merely voicing the opinion of the radiologist. [25]

Where the defendant in a criminal case was arrested in another State without a warrant by police who had probable cause to make the arrest on the basis of information received from Massachusetts police, and the defendant then knowingly and intelligently waived his so called *Miranda* rights after being advised of them and freely and voluntarily made statements to a police officer from Massachusetts, such statements were not to be excluded at the defendant's trial on the ground, asserted by the defendant, that they were fruits of an illegal arrest even if there was some technical noncompliance by the police of the other State with the statutes thereof in arresting him. [25-27]

At a trial for murder of the defendant's wife, where there was evidence that some remains of the wife in a plastic bag were discovered at sea beyond the three mile territorial waters of Massachusetts after the night of the alleged crime, a divorce libel by the wife alleging "brutal and unprovoked assaults" on her by the defendant was properly admitted, not to prove the truth of the allegations therein, as was emphasized by the judge in his charge, but as showing a state of mind of the wife making it unlikely that she went to sea with the defendant in his cabin cruiser on the night of the murder and so relevant to the burden on the Commonwealth of establishing jurisdiction of the Superior Court grounded on a murder of the wife committed within Massachusetts, with disposition of her remains at sea thereafter. [27-28]

Evidence at a trial for murder of the defendant's wife warranted the jury in finding beyond a reasonable doubt that, although remains of the wife were found in a plastic bag at sea beyond the three mile territorial waters of Massachusetts after the night of the alleged crime, the murder was committed within Massachusetts and the wife's remains disposed of at sea by the defendant afterwards and that the Superior Court had jurisdiction of the case. [28-30]

INDICTMENT found and returned in the Superior Court on September 16, 1969.

The case was tried before *McGuire,* J.

*Francis J. DiMento* for the defendant.

*John J. Jennings,* Assistant District Attorney, for the Commonwealth.

TAURO, C.J. At his jury trial in the Superior Court in Essex County, the defendant George B. Gilbert was found guilty of murder in the second degree of his wife Mary. In

this appeal, pursuant to G. L. c. 278, §§ 33A-33G, he makes six arguments for reversal. Four of these relate to evidentiary rulings by the trial judge. The other two separately raise the fundamental questions of (1) the trial court's subject matter jurisdiction and (2) the defendant's right to a speedy trial. We affirm.

The chronology of events in this case involves a wide spectrum of dates and places covering a period of several years. Therefore, we believe it is best to discuss the specific facts as these relate to the respective issues when they are considered during the course of the opinion. Suffice to say at this point that the defendant was charged with the murder of his wife on September 14, 1966; that he dismembered her body and disposed of the remains in the Atlantic Ocean where some of them were dredged up by a fisherman some months later. Before the discovery of the remains it was generally believed that the defendant and his wife had perished at sea during a violent storm on the night of September 14. The defendant reappeared two years and four months later near Las Vegas, Nevada, claiming to be the victim of amnesia. He was arrested but resisted rendition for approximately a year and seven months before he finally returned to Massachusetts voluntarily, pleaded innocent to the charge of murder, and was released on bail pending trial. He was tried and convicted of murder in the second degree on May 30, 1973.

We deal first with the preliminary issue of whether the defendant was denied a speedy trial in violation of his rights under the Fourteenth Amendment to the United States Constitution. *Klopfer* v. *North Carolina,* 386 U. S. 213 (1967). The facts pertinent to this issue may be summarized as follows. The murder with which the defendant was charged allegedly occurred on or about September 14, 1966. From that date until January 30, 1969, the defendant's whereabouts were unknown. On January 30, 1969, the Commonwealth learned that he was in North Las Vegas, Nevada, and on the following day the clerk pro tem of the District Court of Eastern Essex (Gloucester) issued a complaint charging him with murder. Hours later, he was

arrested by the North Las Vegas police. Rendition proceedings were begun on February 4, 1969, and on September 16, 1969, the Essex County grand jury returned a formal indictment. On September 3, 1970, the defendant stopped resisting the rendition process, voluntarily returned to Massachusetts, and surrendered himself at the Superior Court in Salem.

He was arraigned on the same day. His trial, however, did not commence until over thirty-one months later, on April 30, 1973. This period of delay is clearly sufficient in length to trigger serious consideration of the question whether the Commonwealth denied the defendant a speedy trial. *Commonwealth* v. *Horne,* 362 Mass. 738, 743 (1973). Length of delay, however, is but one of several factors relevant to the inquiry. "[T]he reason[s] for the delay, the defendant's assertion of his right, and prejudice" must also be weighed. *Barker* v. *Wingo,* 407 U. S. 514, 530 (1972).

Looking to the record in this case, and to the findings by the trial judge, who denied the defendant's motion to dismiss on the ground that he had been denied a speedy trial, it is clear that the defendant and not the Commonwealth was primarily responsible for the major portion of the lengthy delay. On September 8, 1970, five days after arraignment, the defendant requested and was granted a continuance for the purpose of allowing him time to retain counsel on the question of bail. On October 5, the defendant was released on bail. On the same day, the defendant's motion to extend to October 26 the time for filing preliminary motions was allowed.

In November, 1970, the defendant's counsel, in response to an inquiry from the district attorney as to the setting of a trial date, suggested sometime after January 1, 1971. The case was then put on the trial list for January, 1971. In spite of the defendant's arguments to the contrary, the trial judge's findings warranted by the evidence reveal that the defendant's counsel had other court commitments pending from January to May of 1971, and "consequently the case was put over to the September list of 1971."

Between September, 1971, and March, 1972, the defend-

ant's counsel and the prosecutor participated in meetings in preparation for a seminar on criminal practice held by the New England Law Institute in March, 1972. The parties have stipulated that at "two or three of those meetings and at a chance meeting at the New Court House in Boston . . . [the prosecutor] raised the subject of setting a trial date, but he and . . . [defence counsel] did not pursue the matter further on those occasions." It should be noted that the case had been put on the January, 1972, trial list. While these events do not demonstrate an excess of diligent effort on the part of the Commonwealth to bring the case to trial, they also reveal a degree of acquiescence in the delay by defence counsel. This may have been due, in part, to the fact that the defendant was out on bail and, therefore, had no particular anxiety to go to trial.

The trial judge's findings describe the chronology of subsequent events: "In March of 1972 counsel discussed a trial date, and the District Attorney requested of the Chief Justice [of the Superior Court] a trial date of August 7, 1972. Counsel for the defendant thereupon wrote the Chief Justice a letter requesting a trial date in September 1972, or thereafter, for reasons of personal convenience. From October 5, 1972, to February of 1973, defendant's counsel was unavailable for trial due to illness. Because of defense counsel's schedule of trial of another homicide in this same county, it was agreed to reschedule this trial for April 30, 1973." It was at the opening of the trial on the thirtieth that the defendant first moved to dismiss for failure to provide a speedy trial.

The burden was on the defendant to show that the government unreasonably caused a prejudicial delay. While it is true that "[a] defendant has no duty to bring himself to trial," *Barker* v. *Wingo, supra,* at 527, he cannot rightly complain if his own or his counsel's actions are substantially responsible for the prosecution's failure to press for the earliest possible trial date. *Ibid.* The early portions of the delay in this case are attributable to a continuance and an extension requested by the defendant. Other portions were caused by defence counsel's illness and

commitments to other cases. The only period in this case where the prosecution may have been delinquent in its duty to press for trial occurred between September, 1971, and March, 1972, a span of six months. However, during this time the defendant appears to have made little or no effort to expedite matters, a failure which does not amount to a waiver, *Barker* v. *Wingo, supra,* at 528, but one that does bear on the question whether the defendant met his "responsibility to assert his right." *Id.* at 531. The existence of such a "responsibility" indicates that an acquiescing defendant must also be held partially accountable for pretrial delays. While such acquiescence does not relieve the prosecutor of his duties, it is material in weighing the prosecution's inaction in the balancing test required under *Barker* v. *Wingo,* 407 U. S. at 531.

That the defendant did not assert his right to a speedy trial at any point during the delay is also extremely relevant to the question of prejudice. Indeed, the "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Barker* v. *Wingo, supra,* at 532. If the defendant were truly concerned that the passage of time would undermine his ability to defend himself, common sense dictates that he would have pressed for a speedy trial. By the time he voluntarily returned to Massachusetts, four years had elapsed since his alleged commission of the crime. If the defendant thought that the failure of witnesses' memories would be harmful to his defence, it seems reasonable to assume that he would have asked that the trial be held as quickly as possible after his return. Had he done so, that would have been a compelling argument in his favor. In summation, we think that the Supreme Court's observation that "[t]he more serious the deprivation, the more likely a defendant is to complain" is particularly appropriate here. *Barker* v. *Wingo, supra,* at 531.

We now turn to the other asserted grounds for reversal. The defendant contends that the trial court erred in admitting certain expert testimony introduced by the Commonwealth to prove that the murder victim was the

defendant's wife, Mary Gilbert. The facts pertinent to this
issue may be briefly summarized. On June 11, 1967, off the
coast of Gloucester, a fisherman was engaged in the
common fishing practice of dragging a large net along the
ocean floor. At a point beyond the three mile territorial
waters of Massachusetts, he pulled up his net and dis-
covered a plastic bag containing what he believed to be
human remains. He turned the bag and its contents over to
the police, and on June 20, a medical examiner made an
analysis. In the bag he found two feet, two lower legs, a mid
portion of the trunk from the thoracic vertebra to the fourth
lumbar vertebra, with several ribs still attached, and
decomposed tissue. He concluded that the remains were
those of a person approximately sixty inches in height, plus
or minus two or three inches. He was of the opinion that the
bones had been cut by a hatchet or saw, and that the person
had been dead at least five, but possibly up to eighteen,
months.

With the knowledge of the approximate size of the body,
and with an idea of the probable time of death, the police
then sought to determine the sex and identity of the
deceased person. They turned to Dr. John L. Sosman, a
radiologist who had on other occasions successfully deter-
mined the identity of a dismembered and decomposed
torso by comparing premortem and post mortem X-rays of
bones and bone structure. See *Commonwealth* v. *Devlin,*
365 Mass. 149 (1974). He testified at trial, on the basis of a
comparative X-ray analysis, that the human remains were
those of Mary Gilbert. His opinion was that no two adult
bones are exactly alike and that every individual is unique
in his or her own bone structure. In his brief, submitted
before our decision in the *Devlin* case, the defendant argues
that Dr. Sosman's testimony should not have been allowed
because it was based on a premise which has yet to receive
full scientific approval. We rejected this contention in the
*Devlin* case, where we gave approval to this mode of
identification when applied by a qualified expert. The
evidence was that Dr. Sosman had examined upwards of
800,000 X-rays in his career, and had devoted considerable

time and research to the development of his special expertise in this area. We believe he was clearly qualified to give testimony on the subject.

Wilton M. Krogman, a professor of anatomy with a Ph. D. in physical anthropology, also testified for the Commonwealth. He corroborated Dr. Sosman's conclusion. He examined X-rays of the remains and, like Dr. Sosman, compared them with those taken of Mary Gilbert when she was alive. He was of the opinion that the remains were those of Mary Gilbert. Dr. Krogman explained how he reached this conclusion. "What I did was to go over . . . [Dr. Sosman's] report on a check basis and verify randomly the points that he had made. . . . All I did was corroborate it." He further testified that he would not have offered his opinion that the remains were those of Mary Gilbert on the basis of X-ray comparison had he not had Dr. Sosman's report. The defendant moved to strike Dr. Krogman's opinion on the ground that it was improperly based on the report and conclusions of another witness. The denial of the motion was proper. While the report and findings on which Dr. Krogman relied in part were technically "hearsay," we think they were properly admitted in light of Dr. Sosman's earlier direct presentation of that information to the jury. Moreover, in verifying points of X-ray similarly identified by Dr. Sosman, Dr. Krogman was engaged in independent analysis — he was not merely mouthing another expert's opinion. His testimony was worthwhile cumulative evidence on the reliability of a novel scientific identification technique, and, as such, was properly admitted.

The defendant's next argument relates to the denial of his motion to suppress certain statements he made to the police after he was arrested. The defendant was apprehended in North Las Vegas, Nevada. He claims that this arrest was unlawful and therefore statements made by him while in custody were fruits of illegal police conduct. The following facts are pertinent to this issue. Lieutenant Leo McNulty, of the Massachusetts State Police, learned of the defendant's presence in North Las Vegas on January 30, 1969. On the same day he telephoned officers of the North

Las Vegas police department and related to them some of the evidence against the defendant in connection with his wife's apparent murder. On the following day, a warrant for the defendant's arrest was issued by Marguerite W. Souza, clerk pro tem of the District Court of Eastern Essex, and at 10:30 A.M. McNulty called the North Las Vegas police and informed them of this fact. At 2:30 P.M. the Nevada police, on the strength of this information, arrested the defendant without a warrant. Lieutenant McNulty flew to Nevada the next day and at 8:45 P.M. began interrogating the defendant. The defendant was informed of, and waived, his so called *Miranda* rights. In the course of this interrogation, the defendant made certain statements which he now claims should have been suppressed at his trial. His argument rests on the failure of the Nevada police to comply with local statutory requirements for warrantless arrests of out-of-State fugitives from justice.

The defendant, inter alia, argues that under the Nevada rendition statute, Nev. Rev. Sts. § 179 et seq., a clerk pro tem cannot properly issue a complaint. Under Massachusetts law, however, such a clerk may issue a complaint.

Assuming arguendo that there may have been some question as to the validity of the complaint issued by a nonmagistrate (under Nevada law) at the District Court of Eastern Essex, the fact remains that *Miranda* warnings were given to the defendant. Statements made after a technically illegal arrest are not per se inadmissible — the question is one of voluntariness under the due process clause of the Fourteenth Amendment. See, e.g., *Ralph* v. *Pepersack,* 335 F. 2d 128, 136 (4th Cir. 1964) cert. den. 380 U. S. 925 (1965); *Hollingsworth* v. *United States,* 321 F. 2d 342, 350 (10th Cir. 1963); *Burke* v. *United States,* 328 F. 2d 399, 403 (1st Cir. 1964); *United States* v. *Frazier,* 385 F. 2d 901, 904 (6th Cir. 1967); *Phelper* v. *Decker,* 401 F. 2d 232, 237-238 (5th Cir. 1968). "There is a significant distinction between police action which is unlawful because violative of constitutional provisions and police action which merely fails to accord with statute, rule or some other nonconstitutional mandate." *Ralph* v. *Pepersack, supra,* at 136. The

Superior Court judge found that the Nevada police, relying on Massachusetts police information, had probable cause to arrest the defendant. This finding is clearly in accord with *Whiteley* v. *Warden, Wyo. State Penitentiary,* 401 U. S. 560 (1971). Moreover, the statements made by the defendant came after a knowing and intelligent written waiver of his so called *Miranda* rights. There is no evidence of coercive police behavior of any type. These statements were freely and voluntarily given, and as such, were properly admitted against the defendant at his trial. See generally, *Michigan* v. *Tucker,* 417 U. S. 433 (1974).

The defendant's fifth argument concerns the admission in evidence of a divorce libel filed in September of 1966 by his wife. It was introduced for the purpose of establishing Mary Gilbert's state of mind, a factor relevant to the question where the murder took place and, thus, the court's jurisdiction. The plastic bag allegedly containing some of her remains was found beyond the three mile territorial waters of the Commonwealth. Thus, for jurisdictional purposes, the Commonwealth had to establish that her murder was perpetrated in Massachusetts before her remains were transported and deposited outside the State. See *Commonwealth* v. *DiMarzo,* 364 Mass. 669 (1974). Additional facts relating to the question of jurisdiction will be treated shortly, but it is sufficient at this point to say that the divorce libel was intended to establish that it was unlikely that Mary Gilbert voluntarily went on the boat with her husband on the night of the murder. This evidence was competent to show the state of mind of Mary Gilbert and as a foundation of the inference that the murder occurred on land, prior to the disposition of the body in the ocean. The defendant contends that the libel's prejudicial effect in reciting acts of cruelty by the defendant outweighed any probative value it might have had. The document, introduced in full, and marked as an exhibit, contained the following allegation: "[T]he Libellee . . . [George Gilbert] has been guilty of extreme cruelty to your Libellant, in that on July 4, 1966, the Libellee did commit a most brutal and unprovoked assault upon the person of

your Libellant striking her about the head, face, arms and body, causing her to have a black eye; and that on divers other occasions, too numerous to mention he did commit other brutal and unprovoked assaults upon the person of your Libellant; that as a result of the Libellee's behavior your Libellant has been put in fear for her safety." To the extent that the divorce libel was introduced for the purpose of showing the decedent's state of mind, and not to prove the truthfulness of the allegations, it was admissible. See *Commonwealth* v. *Martin,* 357 Mass. 190, 192 (1970). Leach and Liacos, Handbook of Massachusetts Evidence (4th ed. 1967) 183-184. Unlike the situation in *Commonwealth* v. *DelValle,* 351 Mass. 489 (1966), the decedent's state of mind in the instant case was material to a fundamental issue — that of jurisdiction. Moreover, we think that the trial judge effectively minimized any prejudicial impact possibly stemming from introduction of the divorce libel by his instructions to the jury.[1] While we think the better practice would have been to read portions of the libel to the jury which were pertinent to the decedent's state of mind and with appropriate instructions, instead of having the complete document introduced as an exhibit for continued examination in the jury room, we conclude that there is no error which requires reversal.

We come now to the defendant's sixth and final argument wherein he challenges the Commonwealth's jurisdiction to try the case. The victim's remains were discovered at sea beyond the territorial waters of the Commonwealth. Whether a criminal act occurred within the territorial boundaries of the Commonwealth, and thus whether the Commonwealth has jurisdiction over the individual charged with that act, is a question of fact to be settled by proof. *Dunham* v. *Lamphere,* 3 Gray 268 (1856). *Com-*

---

[1] "[T]he Court is allowing these in evidence, not as to the truth of anything contained therein, as far as any allegations are concerned, but only, I say to you, for the purpose of showing the state of mind of Mary Gilbert on the date that it was signed, not as to the truth of anything that was said therein, but only as to her state of mind on the day she signed it. . . . I cannot be too forceful in repeating to you, do not consider these papers as to the truthfulness of anything contained therein, but only on the state of mind, as I have previously stated to you."

*monwealth* v. *DiMarzo,* 364 Mass. 669 (1974). Since the jury found beyond a reasonable doubt that Mary Gilbert was in fact murdered within Massachusetts, the only question we must consider is whether the evidence "gives rise to 'reasonable and possible' inferences supportive" of that finding. *Commonwealth* v. *Lussier,* 364 Mass. 414, 420 (1973). We believe that it does. George Gilbert was the owner of a cabin cruiser, the Gee Bee, used by him and his family during their summer stay in the Gloucester area. On September 14, 1966, at approximately 11:35 P.M., the Gee Bee was seen heading out to sea in what could be characterized as suspicious circumstances. Besides the late hour, the weather conditions were hazardous and particularly unsuitable for boating. An east to southeast storm was forecast, promising high tides two to three feet above normal, heavy winds, rain, and low visibility. As the Gee Bee headed out to sea that night, it showed no running lights, proceeded at idle speed, and was towing two small boats, one of them with an outboard motor.

The next day the wreck of the Gee Bee was discovered, and both Mary and George Gilbert were missing. The outboard motor boat was at its usual mooring. Mary had last been seen alive on the morning of September 13 at the Gilbert summer cottage. Her car and her husband's car were seen outside their cottage late in the afternoon that day and George had left work around noontime. There is other evidence tending to show deception and evasion on the defendant's part when asked by friends as to his wife's whereabouts and plans on the day of the fourteenth. We think that all these circumstances were sufficient to warrant a jury finding that Mary Gilbert had been murdered sometime before the Gee Bee's ill fated trip. In view of the hour and the weather conditions attending the Gee Bee's surreptitious departure for sea on September 14, the jury could have found that the purpose of the trip was to dispose of Mary Gilbert's already dead and mutilated body, after a murder which had taken place sometime between the morning of the thirteenth and the evening of the fourteenth. From the evidence the jury could have inferred

that the defendant had planned to conceal his crime by simulating an accidental boating disaster at sea. Such a jury finding is supported by evidence that when last seen the Gee Bee was towing an outboard motor boat, the means for his return trip to shore. Mary's expressed fear of the defendant supports the inference that she would not have gone on the boat voluntarily. The record is barren of any evidence of a struggle either on shore or on the boat to indicate that she was alive and forced to go on the boat. We conclude, therefore, that the evidence was sufficient to support the jury's finding that the murder was committed within the territorial limits of Massachusetts.

Pursuant to the requirements of G. L. c. 278, § 33E, we have reviewed the entire transcript and record and have found no basis for ordering a new trial or directing entry of a lesser verdict of guilt.

*Judgment affirmed.*